# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| GOOGLE INC.      Petitioner, | ) ) ) ) |
| v. | ) ) **CASE NO.:** _____ ) |
| JENNER & BLOCK LLP       Respondent. | ) **CASE IN OTHER COURT:** ) No. 3:14-cv-00981-HTW-LRA (S.D. Miss.) ) ) ) ) |

---

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF GOOGLE INC.'S RULE 45 MOTION TO COMPEL COMPLIANCE WITH SUBPOENA

**WILSON SONSINI GOODRICH & ROSATI**
Professional Corporation

Veronica S. Ascarrunz (D.C. Bar No. 494474)
1700 K Street, NW
Fifth Floor
Washington, DC 20006
Email: vascarrunz@wsgr.com
Phone: (202) 973-8800
Fax: (202) 973-8899

David H. Kramer (*pro hac vice* forthcoming)
Michael H. Rubin (*pro hac vice* forthcoming)
650 Page Mill Road
Palo Alto, CA 94304
Email: dkramer@wsgr.com
Email: mrubin@wsgr.com
Phone: (650) 496-9300
Fax: (650) 493-6811

*Attorneys for Petitioner*
GOOGLE INC.

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................ 1

BACKGROUND ......................................................................................................... 4

    A    The Subpoenaed Parties and Attorney General Hood ........................................... 4

    B.    Google's Complaint and the Preliminary Injunction ............................................. 8

    C.    The Subpoenaed Parties' Failure to Produce Any Information .............................. 9

ARGUMENT ............................................................................................................. 11

I.    GOOGLE SEEKS PLAINLY RELEVANT INFORMATION REGARDING THE SUBPOENAED PARTIES' ROLE IN THE ATTORNEY GENERAL'S ILLICIT CONDUCT. ................................................................................................. 11

II.    THE SUBPOENAED PARTIES HAVE NOT VALIDLY ASSERTED ANY PRIVILEGE ............................................................................................................. 15

        1.    Work Product ............................................................................................. 18

        2.    The "First Amendment Privilege" ............................................................. 19

        3.    The "Law Enforcement Privilege" ............................................................. 20

        4.    "Common Interest Doctrine" ..................................................................... 20

        5.    The Attorney Client Privilege .................................................................... 22

III.    THE "FORM OBJECTIONS" ARE BASELES ............................................... 24

IV.    A CONFIDENTIALITY ORDER IS NOT APPROPRIATE ........................... 25

CONCLUSION .......................................................................................................... 26

# TABLE OF AUTHORITIES

## CASES

*Alexander v. FBI*, 192 F.R.D. 50 (D.D.C. 2000) ...............................................................16

*Bank of America, N.A. v. Terra Nova Insurance Co.*, 212 F.R.D. 166 (S.D.N.Y. 2002) ......................................................................................................................17

*Bank Brussels Lambert v. Credit Lyonnaise (Suisse) S.A.*, 160 F.R.D. 437 (S.D.N.Y 1995) ..............................................................................................21

*Baricuatro v. Industrial Personnel & Management Services, Inc.*, No. 11-2777, 2013 U.S. Dist. LEXIS 96413, 2013 WL 3367137 (E.D. La. July 5, 2013) ..............17, 21

*Blackard v. Hercules, Inc.*, 2:12-CV-175-KS-MTP, 2014 U.S. Dist. LEXIS 75934, 2014 WL 2515197 (S.D. Miss. June 4, 2014) ......................................................24

*Boca Investerings Pshp. v. United States*, 31 F. Supp. 2d 9 (D.D.C. 1998) .................22

*Burns v. Imagine Films Entm't, Inc.*, 164 F.R.D. 589 (W.D.N.Y. 1996) .......................23

*Cante v. Baker*, No. 07-CV-1716 (RK), 2008 U.S. Dist. LEXIS 38091 (E.D.N.Y. May 9, 2008) .................................................................................................17

*Cause of Action v. FTC*, 961 F. Supp. 2d 142 (D.D.C. 2013) .......................................18

*Chubb Integrated Sys. v. Nat'l Bank of Washington*, 103 F.R.D. 52 (D.D.C. 1984) ....................24

*Coughlin v. Lee*, 946 F.2d 1152 (5th Cir. 1991) ...........................................................20

*Doe v. MySpace, Inc.*, 528 F.3d 413 (5th Cir. 2008) .....................................................13

*Felham Enters. (Cayman) Ltd. v. Certain Underwriters at Lloyds,* No. Civ. A. 02-3588, 2004 WL 2360159 (E.D. La. Oct. 19, 2004) ..........................................23

*Ferko v. NASCAR*, 219 F.R.D. 403 (E.D. Tex. 2003) ....................................................21

*Friends of the Earth v. United States DOI*, 236 F.R.D. 39 (D.D.C. 2006) ....................25

*Heller v. City of Dallas*, 303 F.R.D. 466 (N.D. Tex. 2014) ...........................................24

*Holland v. Island Creek Corp.*, 885 F. Supp. 4 (D.D.C. 1995) ......................................21

*In re Chevron Corp.*, 749 F. Supp. 2d 141 (S.D.N.Y. 2010) ..........................................22

*In re Chevron Corp.*, 749 F.Supp.2d 170 (S.D.N.Y. 2010) ............................................23

*In re Grand Jury Subpoenas Dated March 9, 2001*, 179 F. Supp. 2d 270 (S.D.N.Y. 2001) .....................................................................................................22

*\*In re Santa Fe Int'l Corp.,* 272 F.3d 705 (5th Cir. 2001) ......................................16, 20

*In re Sealed Case*, 856 F.2d 268 (D.C. Cir. 1988)........................................................20

*In re Verizon Internet Servs., Inc.*, 257 F. Supp. 2d 244 (D.D.C. 2003), *rev'd on
    other grounds, Recording Indus. Ass'n of Am., Inc. v. Verizon Internet
    Servs.,* 351 F.3d 1229 (D.C. Cir. 2003) ..............................................................19

*Info. Res. v. Dun & Bradstreet Corp.*, 999 F. Supp. 591 (S.D.N.Y. 1998) ..................18

*Kline v. Berry*, 287 F.R.D. 75 (D.D.C. 2012) ................................................................24

*La. Generating, L.L.C. v. Ill. Union Ins. Co.*, No. 10-516-JJB-SCR, 2011 U.S.
    Dist. LEXIS 143679 (M.D. La. Dec. 14, 2011)..................................................10

*Low v. Whitman*, 207 F.R.D. 9 (D.D.C. 2002)................................................................25

*Minebea Co. v. Papst*, 228 F.R.D. 13 (D.D.C. 2005) .....................................................22

*NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449 (1958) .................................................19

*Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.3d 1 (D.C. Cir. 2009)..........................................19

*Three Crown Ltd. P'ship v. Salomon Bros.*, No. 92 Civ. 3142 (RPP), 1993 U.S.
    Dist. LEXIS 9995 (S.D.N.Y. July 21, 1993) .....................................................18

*Tri-State Hosp. Supply Corp. v. United States*, No. 00-1463, 2005 U.S. Dist.
    LEXIS 33156 (D.D.C. Dec. 16, 2005)................................................................20

*United States ex rel. Barko v. Halliburton Co.*, No. 1:05-CV-1276, 2014 U.S.
    Dist. LEXIS 181353 (D.D.C. Nov. 20, 2014)......................................................23

*United States ex rel. Landis v. Tailwind Sports Corp.*, 303 F.R.D. 419 (D.D.C.
    2014) ....................................................................................................................21

*United States v. Am. Tel. & Tel. Co.*, 642 F.2d 1285 (D.C. Cir. 1980) ........................21

*United States v. BDO Seidman, LLP*, 492 F.3d 806 (7th Cir. 2007) .............................20

*United States v. Deloitte LLP*, 610 F.3d 129 (D.C. Cir. 2010).......................................17

*\*United States v. El Paso Co.,* 682 F.2d 530 (5th Cir. 1982)................................. passim

*Wilson v. Thompson*, 593 F. 2d 1375 (5th Cir. 1979).....................................................12

*Younger v. Harris*, 401 U.S. 37 (1971)..........................................................................12

*Yousuf v. Samantar*, 451 F.3d 248 (D.C. Cir. 2006).....................................................10

## STATUTES

Section 230 of the Communications Decency Act, 47 U.S.C. § 230 ............................13

Miss. Code Ann. § 25-61-9(1) ......................................................................................16

Mississippi Public Records Act, Miss. Code Ann. § 25-61-1 *et. seq.* ...........................16

**RULES**

Fed. R. Civ. P. 45 .................................................................................................. passim

**MISCELLANEOUS**

Charles Wright & Arthur Miller, Fed. Prac. & Proc., § 2464 ......................................................23

David M. Greenwald, <u>Handbook for Analyzing Issues Under The Attorney-Client Privilege And The Work Product Doctrine</u>, Jenner & Block Practice Series: Protecting Confidential Legal Information, at 355 (2011) ................................................................................................ 17-18, 23

## Introduction

Google Inc. ("Google") respectfully seeks the assistance of this Court to compel compliance with a subpoena issued in connection with litigation in the Southern District of Mississippi, where Google sued Mississippi Attorney General Jim Hood ("AG Hood") and the court has already issued a preliminary injunction prohibiting him from violating Google's constitutional and federal statutory rights.

For the past two years, AG Hood has repeatedly threatened Google, demanding it remove content from its online services that he and a group of powerful special interests deem objectionable. When Google refused his demands citing the protections of federal law, AG Hood retaliated with a vexatious 79-page Civil Investigative Demand ("CID").[1] In March, with the benefit of a substantial evidentiary record, the Honorable Henry Wingate of the Southern District of Mississippi concluded there was "compelling evidence" that the Attorney General's CID was issued in "bad faith" with retaliatory intent and that there is a "substantial likelihood" that Google will prevail on its claims that the Attorney General was violating Google's First and Fourth Amendment rights. The court therefore enjoined the Attorney General from enforcing his CID, filing charges against Google, or otherwise taking further action against Google pending a final decision on its claims that he described as "substantially meritorious."[2] Judge Wingate also set an expedited case schedule, allowing a very limited time for discovery.

Although Google's lawsuit is against Attorney General Hood, the architects of his campaign against Google appear to be interest groups that have spent years lobbying states' attorneys general to pursue an anti-Google agenda. As widely reported in the press, these third

---

[1] The document is formally titled "Administrative Subpoena" rather than "Civil Investigative Demand." It contains 141 document requests and 62 interrogatories, demanding the production of an extraordinarily broad array of information. It is so large that it includes a table of contents.

[2] Declaration of Michael H. Rubin ("Rubin Decl.") ¶ 21, Exhibit ("Exh.") 53 ("PI Order").

parties, including the Motion Picture Association of America (the "MPAA"), lobbyists at the

firm Jenner & Block ("Jenner"), and a supposed consumer rights organization heavily funded

by the MPAA called the Digital Citizens Alliance ("DCA") (collectively, the "Subpoenaed

Parties"), have acquired significant influence with state law enforcers, particularly with the

Mississippi Attorney General.[3]  Documents uncovered by reporters reveal that these groups

formulated a list of demands to be sent to Google by Attorney General Hood and other state

attorneys general, they actually wrote letters to Google that Attorney General Hood sent, they

dictated the timing of his investigative escalations, they tried to recruit others government

officials to support him, and they even prepared the 79-page CID at the center of this case.  As

shown in one internal email, apparently between the MPAA and its allies, when Attorney

General Hood's demand letters did not yield the result that the Subpoenaed Parties desired,

"word came down" from the MPAA's lead lobbyist at Jenner "that 'the time for letter writing is

over' and that 'it is time to move to actually form an investigation.'"  He explained:

> Some subset of AGs (3-5, but Hood alone if necessary) should move toward issuing CIDs [and] [i]n terms of outreach and action by us, I think we should: a. Shore up Hood and try to get a small group . . . focused on a clear timetable for CIDs[;] b. Draft the CIDs[; and] c. Research state law to determine the best state to pursue litigation and communicate that to Hood so that he can try to get the right AGs on board.[4]

Given this and a raft of similar communications detailed in press reports, Google subpoenaed

these parties for information about their behind-the-scenes maneuvering that fomented Attorney

General Hood's violations of Google's Constitutional and federal rights.

---

[3] See Russell Brandom, "Project Goliath: Inside Hollywood's Secret War Against Google," The Verge, Dec. 12, 2014, *available at* <http://www.theverge.com/2014/12/12/7382287/project-goliath> (hereafter "Brandom Article").

[4] See Joe Mullin, "Hollywood v. Goliath: Inside the Aggressive Studio Effort to Bring Google to Heel," Ars Technica (Dec. 19, 2014), *available at* <http://arstechnica.com/tech-policy/2014/12/how-hollywood-spurned-by-congress-pressures-states-to-attack-google/> (hereafter "Mullin Article").

The narrowly-drawn subpoenas seek information from the Subpoenaed Parties that is directly related to Attorney General Hood's actions against Google.  This includes their direct correspondence with the Attorney General, as well as communications among themselves and their cohorts referencing both the Attorney General and Google.  Google also seeks information relating to the Subpoenaed Parties' campaign donations to the Attorney General as well as other forms of assistance they provided in their lobbying efforts, such as advocacy pieces, ghostwritten documents, legal assessments, and solicitations of others to the cause.

To date, the Subpoenaed Parties have produced nothing.  They have withheld all responsive documents, objecting that they are irrelevant or protected by some unidentified and unsubstantiated privilege.

The relevance objections are meritless.  As Judge Wingate has already held, there is substantial evidence that the Attorney General's actions against Google were undertaken in bad faith and for a retaliatory purpose.  The requested documents are likely to bolster that finding by shining a light on the parties that were animating the Attorney General and other government officials.  Google expects the documents will show that the Attorney General, and the Subpoenaed Parties influencing him, understood that his actions invaded the exclusive province of federal law.  More fundamentally, the documents are likely to show that the Attorney General's investigation was intended not to uncover supposed violations of Mississippi law, but instead to coerce Google into silencing speech that the Subpoenaed Parties do not like (such as search results, user-generated content and advertising), in violation of Google's constitutional rights.  The relevance objections cannot stand.

The privilege assertions should fare no better.  Each Subpoenaed Party asserts "work product protection," but none can identify any litigation they contemplated at the time the

requested documents were created.  They claim there is a "First Amendment privilege" shielding their activities from discovery, but they cannot explain how it applies here where they are engaged in lobbying government officials, where that lobbying is a matter of public record, and where their conduct is in no way likely to meet with government reprisal.  And they assert "common and joint interest privileges" but cannot articulate any valid "interest" that creates or preserves a privilege.  While *some* responsive documents *might* theoretically be subject to the attorney-client privilege, the Subpoenaed Parties have not even collected or reviewed such documents, let alone provided a privilege log for them.  All of these privilege issues, they claim, should await Judge Wingate's resolution of a motion to compel that Google has filed against Attorney General Hood (although the Subpoenaed Parties refuse to be bound by that decision).[5]

Given the narrow window afforded for discovery in this case, Google can wait no longer.  It respectfully requests that the Subpoenaed Parties be ordered to produce the documents responsive to the subpoena immediately.

## Background

### A. The Subpoenaed Parties and Attorney General Hood

In late 2014, the *New York Times* reported that the MPAA, the DCA, and other special interest groups had been engaged in an extensive and secret anti-Google lobbying campaign with state attorneys general.[6]  Having failed to gain federal support for their positions, these

---

[5] This motion is not brought in isolation. Google seeks similar orders against six different entities, five of which are represented by different lawyers at the same firm (Jenner) and each of which offers the same relevance and privilege objections. In the interests of judicial economy, and to avoid potential inconsistencies in fact-finding or outcomes, Google will promptly submit a motion under Rule 45(f) to consolidate and transfer all of these motions to the Southern District of Mississippi.  Such an order is particularly justified given the acknowledgement by two of the Subpoenaed Parties that Judge Wingate's rulings on similar issues will bear on their productions and this motion.

[6] Nick Wingfield and Eric Lipton, *Google's Detractors take Their Fight to the States*, The New York Times (Dec. 16, 2014), *available at* <http://www.nytimes.com/2014/12/17/technology/googles-critics-enlist-state-attorneys-general-in-their-fight.html>.  In its reporting, the Times drew upon documents obtained

groups hoped state officials could be more easily convinced to pressure Google to modify its online services and restrict both its own speech and the speech of its users.  The articles quote internal emails from MPAA representatives about "aggressively lobbying" state attorneys general "to build cases against Google" over what they claim was Google's supposed indulgence of copyright infringement.  By the fall of 2012, these groups had the vanguard for their anti-Google agenda in Mississippi's Attorney General, Jim Hood.

Following a November 2012 meeting of states attorneys general that was convened to discuss intellectual property and prescription drug issues, AG Hood sent Google a letter suggesting steps it should take "to eliminate or significantly reduce infringing activities," and requesting Google's thoughts on altering its search results and blocking links to publicly available websites.  Attorney General Hood was later clear about what would happen if Google did not "voluntarily" capitulate:

> [I]f you don't ... work with us to make some of these changes that we've been suggesting since November, then I'm going to call on my colleagues to issue civil investigatory demands or subpoenas.

Rubin Decl. ¶ 22, Exh. 54 at 8:8-13 (transcript from June 2013 meeting of National Association of Attorneys General).  Google responded that its operations were consistent with and protected by federal law, that it would continue to work to address legitimate concerns, and that the threats from the Attorney General were improper.

Nevertheless, on November 19, 2013, Attorney General Hood emailed Google's general counsel attaching a draft letter reiterating demands that Google alter search results to promote "authorized" websites while downgrading others; that it remove videos from its YouTube service; and that it bar advertising from supposed "piracy" sites.  The draft letter was not written

---

through public records requests and from an industry insider following the well-publicized revelation of a cache of emails from Sony Entertainment after a reported hack.

by the Attorney General Hood or his staff; it was written almost entirely by the MPAA's lobbyists at Jenner. Compl. ¶ 55;[7] Rubin Decl. ¶ 26, Exh. 58 at D-000082.[8]  Attorney General Hood then privately reported to the MPAA that he had sent their letter because his "conversation with Google's General Counsel did not go well," and that there would soon be a meeting with other state attorneys general and the MPAA's representatives so "we can all discuss the next move."  Rubin Decl. ¶ 27, Exh. 59 at D-000001-02 (email exchange between Attorney General Hood—using a private Hotmail email account rather than an official one—to Vans Stevenson, the MPAA's VP of state legislative affairs).[9]

In January 2014, MPAA's lead lobbyist at Jenner, Tom Perrelli, met privately with the Attorney General the day before a planned discussion between Google, Mississippi Attorney General Hood, and representatives from at least 20 other states.  Perrelli reported back to the MPAA and its allies on his lobbying in an internal email:

> I spent more time with Hood . . . and, I hope, got him focused on the key issues and the asks. He really does care a great deal about piracy . . . [he] wants Google to delist pirate sites and he is going to ask them to do that tomorrow.[10]

The Subpoenaed Parties' influence on the Attorney General did not end there.  Four days before a February 2014 meeting between Google and a group of Attorneys General, AG

---

[7] *See Letter to Google From Mississippi's Attorney General*, The New York Times (Dec. 16, 2014), *available at* <http://www.nytimes.com/interactive/2014/12/16/technology/attorney-general-letter-to-google.html> (showing a redline version that compares the letter drafted by Jenner and the version sent by Attorney General Hood to Google); *see also* Rubin Decl. ¶ 24, Exh. 56 (October 24, 2013 email from Attorney General Hood to MPAA stating "Tom [Perrelli] drafted great letter that I will send Google for agenda.").

[8] All citations formatted "D-0000..." refer to Bates numbers of documents produced by AG Hood to Google in the underlying litigation.

[9] *See also* Mullin Article (quoting email from the MPAA's Van Stevenson to the Recording Industry Association of America ("RIAA") and others in which Stevenson summarizes Hood's email).

[10] Mullin Article (quoting email from Jenner's Perrelli to "the group," apparently including at least the MPAA, its member movie studios and the RIAA). Perrelli clearly wanted his clients to control what AG Hood and other Attorneys General were asking Google for, and what they would accept: "The AGs are struggling with their asks.  They understand that Google is likely to offer a few morsels, they know it won't be sufficient, but they are unsure how to demand more...I went over their likely asks again, but encouraged them not to commit to anything with Google in the meeting."

Hood received an email from a DCA lobbyist proposing a "pre meeting" on Google and asking whether he "want[ed] the Digital Citizens [Alliance], and industry folks to be at or around his pre meeting on [M]onday morning."[11]  When Google's representatives walked into that meeting, they were handed a document that the DCA had prepared called "Digital Weeds: How Google Continues to Allow Bad Actors to Flourish on YouTube." Compl. ¶ 65.

When Google did not acquiesce in these meetings to the "asks" from Attorney General Hood and his benefactors, "word came down" from Jenner's Perrelli that "the time for letter writing was over" and it was time for AG Hood (and other Attorneys General if they could be persuaded) to follow through on the threatened CIDs, which the Subpoenaed Parties would prepare. *See* Mullin Article (quoting email from Perrelli to a collection of anti-Google interests); *see also* Brandom Article.

On October 27, 2014, the Attorney General sent Google the 79-page CID.  AG Hood has identified the CID as having been authored by Jenner's Perrelli as well as representatives of Microsoft.[12]  The hope, according to an email between the MPAA and its six member studios, was that "following the issuance of the CID by AG Hood . . . *we may be in a position for more serious discussions with Google.*"[13]

---

[11] *Exchanges Between Current and Former Mississippi Attorneys General*, The New York Times (Dec. 17, 2014), p. 32 (including copy of Feb. 20, 2014 email from Mike Moore to Attorney General Hood), *available at* <http://www.nytimes.com/interactive/2014/12/17/technology/document-exchanges-between-current-and-former-missippippi-attorneys-general.html>.

[12] AG Hood listed a draft of the CID in a privilege log he provided to Google.  That claim of privilege is currently under review by Judge Wingate in Mississippi.

[13] Brandom Article, *available at* <http://www.theverge.com/2014/12/12/7382287/project-goliath> (emphasis added).  According to Brandom, emails that the MPAA circulated to as many as 62 different people suggest the group viewed a *New York Times* series on political corruption, "not as a cautionary tale but as an instruction manual."

**B. Google's Complaint and the Preliminary Injunction**

On December 19, 2014, Google filed a Complaint for Declaratory and Injunctive Relief in the Southern District of Mississippi alleging, among other things, that the Mississippi Attorney General violated Google's rights under the First, Fourth, and Fourteenth Amendments by pursuing a retaliatory and overbroad investigation aimed at silencing Google's protected speech and the speech of others. Dkt. 1 (Complaint), *Google Inc. v. Hood*, Case No. 3:14-cv-00981-HTW-LRA (S.D. Miss. Dec. 19, 2014).[14] Google sought a Preliminary Injunction (the "Injunction Motion") based on a substantial evidentiary record. MS Dkt. 2, 3. On March 2, 2015, Judge Wingate granted Google's motion enjoining Attorney General Hood from, among others things, enforcing the CID.

Judge Wingate detailed his reasoning in a March 27 Opinion. Rubin Decl. ¶ 21, Exh. 53 (PI Order). He held that Google had demonstrated a "substantial likelihood" that Attorney General Hood "has violated Google's First Amendment rights by: regulating Google's speech based on its content; by retaliating against Google for its protected speech (i.e., issuing the subpoena); and by seeking to place unconstitutional limits on the public's access to information." *Id*. at 18. According to Judge Wingate, "[t]he Attorney General's interference with Google's judgment" through "threats of legal action and an unduly burdensome subpoena" is likely to "produce a chilling effect on Google's protected speech." *Id*. at 19. That finding was based on "competent evidence showing that the Attorney General issued the subpoena in retaliation for Google's likely protected speech, namely its publication of content created by third-parties." *Id*; *see also id.* at 14 ("Google has presented significant evidence of bad faith, allegedly showing that Attorney General Hood's investigation and issuance of the subpoena represented an effort to coerce Google to comply with his requests regarding content

---

[14] All citations herein to "MS Dkt." refer to the docket in this underlying action before Judge Wingate.

removal."). Judge Wingate also found "substantial merit" in Google's Fourth Amendment claims given the "overbreadth of the subpoena in question." He explained that "Attorney General Hood's subpoena must comport with the requirements of the Fourth Amendment and not wage an unduly burdensome fishing expedition into Google's operations." *Id.* at 19-21 (concluding the CID demanded information regarding copyright issues and content that the Attorney General knew was outside his enforcement purview).

### C. The Subpoenaed Parties' Failure to Produce Any Information

In issuing the preliminary injunction on March 2, Judge Wingate opened discovery and directed that it be completed within 90 days, explaining that "[t]his matter will be adjudicated quickly." *See* Rubin Decl. ¶ 20, Exh. 52 at 4. On March 12, 2015, Google served identical document subpoenas on the MPAA, the DCA, and Jenner, containing only eight, highly-targeted requests for documents:

- Documents relating or referring to Google and Attorney General Hood, and/or his investigation into Google, including communications between or among the Subpoenaed Parties, Attorney General Hood, and other parties identified in published news reports as participating in the anti-Google lobbying effort (Requests No. 1, 2, 3, 8);

- Documents referencing code names for the Subpoenaed Parties' efforts to influence Attorney General Hood and other state Attorney Generals to take action against Google, position papers that they developed in support of that effort, and other documents such as draft legal process and research connected to the effort that have been described in the news reports (Requests No. 5, 6, 7, 8);

- Documents relating or referring to campaign assistance, including monetary contributions, made by the MPAA, the DCA, or Jenner to Attorney General Hood directly or through umbrella organizations (Request No. 4).

Rubin Decl. ¶ 2, Exh. 1, 2, 6.

On March 23 and March 24, 2015, Google received a letter from the MPAA—through Jenner—and a nearly identical letter from the DCA. They both took the same position, i.e., that

Google's subpoenas were "premature" because discovery had not opened.[15]  Rubin Decl. ¶ 3, Exh. 7, 9 (letters to Google from counsel).  Days later, all three Subpoenaed Parties wrote letters reiterating that the subpoenas were premature and adding blanket objections.  Rubin Decl. ¶ 4, Exh 10, 11, 13. (the "Objections"). Google sought confirmation from Judge Wingate that discovery was open, and on April 10, 2015, Judge Wingate confirmed discovery had opened on March 2, making clear the subpoenas had been proper from the start.  Rubin Decl. ¶ 5, Exh. 14 (Order on *Ore Tenus* Discovery Motion, Apr. 10, 2015), at 2 (confirming discovery as to third parties opened March 2).  Google promptly informed the Subpoenaed Parties of his order and, as a courtesy, extended their response deadline to the Subpoenas until April 17, 2015.  Rubin Decl. ¶ 6, Exh. 15, 16, 18.

On April 24, a week *after* the already-extended deadline, the Subpoenaed Parties agreed to produce a narrow subset of the requested documents, i.e., "documents to which Attorney General Hood's Office was a party."  Rubin Decl. ¶ 9, Exh. 27, 28, 32 (the "April 24 Responses").[16]  But not even this narrow group of documents has yet been produced, as the MPAA and Jenner claim they can withhold them until Judge Wingate rules on a motion to compel that Google filed against Attorney General Hood in Mississippi.  Rubin Decl. ¶ 9, Exh. 27, 28 (April 24, 2015 letters to Google from MPAA and Jenner).  Everything else, they claim, is irrelevant or privileged.  *Id.*

---

[15] Google also received virtually identical letters from three movie studio members of the MPAA to whom it sent similar subpoenas.  They too are apparently represented by Jenner.

[16] The Subpoenaed Parties attempted to assert additional objections in their April 24 Responses. Because they were untimely, i.e., asserted seven days after Google's courtesy extension and well past the Rule 45 deadline, they were waived and therefore are not addressed here. *La. Generating, L.L.C. v. Ill. Union Ins. Co.*, No. 10-516-JJB-SCR, 2011 U.S. Dist. LEXIS 143679, at *6 (M.D. La. Dec. 14, 2011) ("Courts within the Fifth Circuit have consistently held that failure to serve timely objections to a Rule 45 subpoena generally results in a waiver of all grounds for objection, including privilege."); *see also Yousuf v. Samantar*, 451 F.3d 248, 252 (D.C. Cir. 2006) (stating that a court generally cannot consider untimely objections as they have been waived).

On May 11 and 13, Google participated on calls with two different sets of Jenner lawyers regarding the Objections from Jenner and the MPAA. Rubin Decl. ¶ 10, 12. On May 19, Google met and conferred with counsel for the DCA. Rubin Decl. ¶ 13. The parties subsequently exchanged letters regarding their positions. Rubin Decl. ¶¶ 14-19. As of this filing, Google has still not received a single document or privilege log and the parties are at an impasse on the issues of relevance and privilege. Google now seeks the Court's assistance to break that impasse or, as set forth in the Rule 45(f) motion to be filed shortly, to transfer this dispute to Mississippi.

## Argument

### I.    Google Seeks Plainly Relevant Information Regarding the Subpoenaed Parties' Role In the Attorney General's Illicit Conduct.

One of the principal issues in Google's case against Attorney General Hood is the question of what motivated him to send Google the oppressive CID. Was he actually investigating some supposed violation of Mississippi law, or was the CID a coercive tactic in a campaign by the Attorney General and the Subpoenaed Parties to force Google to restrict constitutionally protected speech that they dislike? Judge Wingate has already made clear his views. On the record compiled to date, he found Google likely to succeed on its claim that the CID was sent in retaliation for Google's refusal to "voluntarily" censor the speech (e.g. Google's search results), and thus violated Google's rights. When the case is ultimately tried, Google expects that the evidence it uncovers though the subpoenas at issue here will strongly support its claims.

Based on just the handful of documents that have come to light through press accounts, there is little doubt that the Subpoenaed Parties actually directed the Attorney General's misconduct at issue in this case. Over a nearly two-year period prior to Google's lawsuit, it was

-11-

they who determined the Attorney General's demands, they who wrote the letter in which the

demands were conveyed, they who declared when "the time for letter writing" had ended, and

they who drafted the CID that Attorney General Hood sent.  Throughout that time, the

Subpoenaed Parties communicated extensively with the Attorney General's office, among

themselves and with their allies to plot their anti-Google strategy.  Google's requests for

documents relating to that effort will undoubtedly shed further light on the Attorney General's

motives.  They may show, for example, that the Attorney General and the Subpoenaed parties

expressly discussed use of the CID as a retaliatory measure—a weapon to be used if Google did

not capitulate in their demands.  The documents are also likely to demonstrate that the Attorney

General and the Subpoenaed Parties knew just how oppressive and burdensome the 79-page

CID was, and intentionally drafted it that way in the hopes that Google would agree to silence

speech rather than spend the millions of dollars required to respond to it.  In short, Google's

requests that the Subpoenaed Parties produce documents discussing Attorney General Hood and

his investigation of Google are not only reasonably calculated to lead to the discovery of

admissible evidence regarding the Attorney General's motives, they are likely to uncover some

of the most relevant information in the case.

   The requested documents are similarly relevant to Attorney General Hood's affirmative

defense based on the *Younger* abstention doctrine.  *See Younger v. Harris*, 401 U.S. 37 (1971).

The Attorney General contends that despite the impact of his CID on Google's constitutional

rights, Judge Wingate should decline to hear the case in deference to Mississippi state courts.

MS Dkt. 93 (AG Answer); *see also* MS Dkt. 32 (AG Mtn to Dismiss).  But *Younger* is

inapplicable where a state official's conduct is improperly motivated or undertaken in bad faith.

*See, e.g., Wilson v. Thompson*, 593 F. 2d 1375, 1387 (5th Cir. 1979).  And as Judge Wingate

held, Google has already adduced "compelling evidence of bad faith" in the Attorney General's treatment of Google. The Subpoenaed Parties' documents should reveal considerably more such evidence, showing that it was their business interests and campaign contributions, rather than concerns about Mississippi law, that moved the Attorney General to action.

The Subpoenaed Parties' documents also bear directly on Google's claim that the Attorney General's investigation, and specifically the CID, were intentionally overbroad and burdensome and thus constitute an unreasonable search and seizure in violation of Google's 4th Amendment rights. Compl. ¶ 103. Judge Wingate recognized that the CID's scope exceeds the Attorney General's powers in several respects. For one, a large number of the CID's requests for information relate to alleged copyright infringement taking place through Google's service. As Judge Wingate noted, "[i]t is well-established that state attorneys [general] lack the authority to enforce the Copyright Act." Rubin Decl. ¶ 21, Exh. 53 (PI Order), at 20. It thus appears that Attorney General Hood demanded this information for an illegitimate purpose (presumably to appease the Subpoenaed Parties for whom copyright is a paramount interest). The CID similarly demands extensive information to support Attorney General Hood's threats to hold Google responsible for third-party content published on Google's services. *See* MS Dkt. 17, Exh. 30 (CID). But, as Judge Wingate recognized, Section 230 of the Communications Decency Act, 47 U.S.C. § 230, immunizes Google from claims based on such content. Rubin Decl. ¶ 21, Exh. 53 (PI Order), at 16-17 (citing *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008) ("Courts have construed the immunity provisions in § 230 broadly in all cases arising from the publication of user-generated content.")). Given that, it appears that here again, the Attorney General demanded information not for any legitimate purpose, but to burden or perhaps embarrass Google. In light of their role in researching and preparing the CID, it is quite

-13-

likely that the Subpoenaed Parties discussed the CID's impermissible overbreadth and obvious burden in communications with the Attorney General, other government officials, and among themselves.  Documents reflecting those communications – indeed, any documents relating to the scope and burden of the Attorney General's investigation of Google – are directly relevant to Google's Fourth Amendment claim.

Finally, the documents that Google seeks will bear on Attorney General Hood's credibility. For example, the Attorney General has denied knowing that Mr. Perrelli works for Jenner or that there is a relationship between Jenner and the MPAA.[17] That is suspect at best, given that the documents described in press reports show direct and personal communications between the two men about the investigation of Google.  *See, e.g.,* Rubin Decl. ¶ 21, Exh. 55 at D-000075-76 (9/12/13 heavily redacted email exchange between Perrelli and Hood but still showing Perrelli's signature at Jenner.  Perrelli: "I wanted to see if there was a time when we could catch up on Google."  Hood: "Is there a good time for you tomorrow?").  Other documents will similarly cast doubt on the Attorney General's veracity.  In his answer in this case, for example, the Attorney General denies coordinating with third parties and lobbyists regarding Google.  *See, e.g.*, MS Dkt. 93 (Def.'s Answer), ¶¶ 49, 64.  Given what Google already has seen, that cannot withstand scrutiny.  The documents Google seeks, such as meeting notes, agendas, action lists and reports on verbal conversations are all likely to undermine the Attorney General's averments.

The relevance of all of these materials is not lost on the Subpoenaed Parties.  Their promise to produce direct correspondence with Attorney General Hood shows as much.  But

---

[17] Dana Liebelson, "Emails Show Hollywood Worked With A State Attorney General To Push Its Anti-Piracy Agenda," *The Huffington Post* (Dec. 18, 2014), *available at* <http://www.huffingtonpost.com/2014/12/18/movie-piracy_n_6348256.html> (Hood told a reporter that he "could not tell you which law firm [Mr. Perrelli] works for now," and he was "not aware" of the relationship between Jenner and the MPAA.)

that as-yet unfulfilled promise is far too restrictive.  Just as emails to and from the Attorney

General are relevant, so too is correspondence with others in which meetings and conversations

with the Attorney General were planned or discussed.[18]  Indeed, several of the most damning

documents surfaced to date are not direct correspondence between the Subpoenaed Parties and

AG Hood, but rather the Subpoenaed Parties' communications amongst themselves and their

allies.  *See e.g.*, Mullin Article (quoting email where Mr. Perrelli writes to MPAA and others

about getting Hood focused on "key issues and the asks"); Brandom Article (quoting email

where MPAA lobbyist states that "it is time to move to actually form an investigation.").

Furthermore, internal documents reveal communications from other state attorneys general

declining to join AG Hood's efforts or sign his letters to Google.[19]  It is in these internal

communications, rather than in documents they presumably knew would be subject to public

records requirements, that the true nature of AG Hood's actions is most likely to be revealed.

## II.     The Subpoenaed Parties Have Not Validly Asserted Any Privilege

In addition to contesting relevance, the Subpoenaed Parties have invoked various

privileges to block discovery into their involvement in AG Hood's investigation.  They contend

that the documents Google seeks are protected under the work product doctrine, a First

Amendment privilege, a law enforcement privilege, a common interest doctrine, the attorney-

---

[18] From just the smattering of documents Google has seen, it is clear that the Subpoenaed Parties sought to enlist other states' law enforcers to support Attorney General Hood's efforts.  *See* Rubin Decl. ¶ 25, Exh. 57 (email from V. Stevenson to AG Hood asking, "[h]ow are you coming with AGs signing on to the letter?  As we talked about, let me know if you need help motivating any of your colleagues."); *see also* Mullin Article (quoting Feb. 27, 2014 email from Perrelli saying "some subset of AGs (3-5, but Hood alone if necessary) should move toward issuing CIDs before mid-May.").  But they found no one willing to do so. Google does not know why other states' officials declined to support Attorney General Hood, but its position in the case would be strengthened (and Attorney General Hood's weakened) if documents show that other states refused to participate in light of concerns about the CID's (a) retaliatory and speech chilling purpose and effect; or (b) gross overbreadth.

[19] *See* Rubin Decl. ¶ 26, Exh. 58 at D-000084-85 (Sept. 17, 2013 email from MPAA to AG Working Group noting that AG Hood relayed that California's attorney general, Kamala Harris, had turned down AG Hood's offer for her to host a meeting of states attorneys general with Google and that "she had decided not to sign-on to the AG letter currently being drafted to Google.").

client privilege and other, unidentified "evidentiary, discovery, or ethical privileges or immunities." When Google pressed for support of these assertions, the Subpoenaed Parties offered nothing but conclusory statements.[20] That is patently insufficient. *In re Santa Fe Int'l Corp.*, 272 F.3d 705, 710 n. 7 (5th Cir. 2001) ("Fifth Circuit cases clearly hold that the privilege claimant's burden extends to proof of preliminary facts showing that the matter is eligible for protection."); *see also Alexander v. FBI*, 192 F.R.D. 50, 54 (D.D.C. 2000) ("The proponent of the privilege must conclusively prove each element of the privilege.") (citation and internal quotations omitted).

The Subpoenaed Parties' inability to substantiate their privilege assertions is no surprise. To begin with, they have not even collected responsive documents and thus could not possibly know whether any privilege applies to them. More fundamentally, the notion that lobbying activities can be cloaked in privilege is untenable. The Subpoenaed Parties worked hand-in-hand with a government official, with whom they have no attorney-client relationship. They could not have had an expectation that their communications could be kept confidential -- particularly in light of Mississippi's freedom of information law.[21] And absent an expectation of confidentiality, there can be no privilege. *See United States v. El Paso Co.*, 682 F.2d 530, 539 (5th Cir. 1982) ("The need to cloak [privileged] communications with secrecy, however, ends when the secrets pass through the client's lips to others. Thus, a breach of confidentiality

---

[20] *E.g.*, Rubin Decl. ¶ 15, Exh. 38 (Jenner's May 21, 2015 letter "disagree[ing]" that we have no basis for our assertion of privilege," while stating only that "it is obvious" that most of the documents sought "are subject to the attorney-client privilege"); *see also* Rubin Decl. ¶ 9, Exh. 28 (MPAA's Apr. 24, 2015 stating "we maintain our already stated position that documents not sent to Attorney General Hood ... are in many cases protected from production by multiple privileges and immunities," without further explanation).

[21] *See* Mississippi Public Records Act, Miss. Code Ann. § 25-61-1 *et. seq.* Under this Act, even documents originating from third parties containing their "trade secrets or confidential commercial or financial information" are, upon notice to the third party, subject to release to the public "within a reasonable period of time unless the said third parties shall have obtained a court order protecting such records as confidential." Miss. Code Ann. § 25-61-9(1).

forfeits the client's right to claim the privilege.") (citation omitted); *see also United States v. Deloitte LLP*, 610 F.3d 129, 139-40 (D.C. Cir. 2010) ("Voluntary disclosure waives the attorney-client privilege because it is inconsistent with the confidential attorney-client relationship." (citation omitted)).

Courts have applied this basic principle to reject attempts to cloak lobbying efforts in secret through privilege invocations.  In *Baricuatro v. Industrial Personnel & Management Services, Inc.*, for example, the court considered a claim of work product privilege asserted over documents a party had voluntarily submitted to Federal agencies with the hope of securing an advantage against an adversary. No. 11-2777, 2013 U.S. Dist. LEXIS 96413, at *36-38, 2013 WL 3367137 (E.D. La. July 5, 2013).  The court looked concluded that the documents had been offered up "with the primary purpose of provoking or assisting in the government's criminal or administrative investigations." *Id*. at *37.  As the court recognized, the voluntary submission of documents waived any work product privilege over the documents. *Id*.  Similarly, in *Bank of America, N.A. v. Terra Nova Insurance Co*., the court considered materials disclosed by a private party during meetings with state and Federal law enforcement agencies where the party hoped to induce action against an adversary.  212 F.R.D. 166, 172-74 (S.D.N.Y. 2002).  As the court pointed out, there was "a strong potential that the material may ultimately become public and thus available to an adversary." *Id*. at 173-74 (possibility of government disclosure for tactical reasons, use at trial, as exculpatory evidence or in response to FOIA request waives any work product protection over documents); *see also Cante v. Baker*, No. 07-CV-1716 (RK), 2008 U.S. Dist. LEXIS 38091, at *2 (E.D.N.Y. May 9, 2008) (rejecting privilege claims over materials submitted to a government agency to induce beneficial action); David M. Greenwald, Handbook for Analyzing Issues Under The Attorney-Client Privilege And The Work Product

-17-

Doctrine, Jenner & Block Practice Series: Protecting Confidential Legal Information, at 355 (2011) (the "Jenner Privilege Handbook") (with respect to lobbying, "communications that relate solely to political advice or strategizing are not protected."). In other words, when a party makes a "voluntary submission of material to a government agency to incite it to attack the informant's adversary," that party cannot then go on to claim privilege over those materials. *Info. Res. v. Dun & Bradstreet Corp.*, 999 F. Supp. 591, 593 (S.D.N.Y. 1998); *see also Three Crown Ltd. P'ship v. Salomon Bros.*, No. 92 Civ. 3142 (RPP), 1993 U.S. Dist. LEXIS 9995, at *6 (S.D.N.Y. July 21, 1993) ("[T]he Court will allow liberal discovery of statements made or documents submitted to a governmental agency prior to the initiation of an investigation of any defendant in this litigation concerning the subject matter of this litigation.").

Beyond these fundamental flaws, the Subpoenaed Parties' privilege assertions suffer from additional infirmities:

### 1. Work Product

The Subpoenaed Parties seek to invoke work protection over some unspecified subset of documents related to AG Hood's anti-Google efforts. But the "work product doctrine focuses only on materials assembled and brought into being in anticipation of litigation." *El Paso*, 682 F.2d at 542 ("The work product doctrine is not an umbrella that shades all materials prepared by a lawyer"); *see also Cause of Action v. FTC*, 961 F. Supp. 2d 142, 167 (D.D.C. 2013) ("[T]here must exist some articulable claim that is likely to lead to litigation in order to qualify the documents as attorney work-product.") (citations omitted). In the parties' meet and confer discussion, Google asked each to identify the actual or anticipated litigation that supported their invocation of work product. They were unable or unwilling to do so. The absence of actual or anticipated litigation dooms any work product protection, even putting aside: (i) the failure to

-18-

specify the documents over which the protection is claimed; (ii) the failure to substantiate the claim when asked; and (iii) the forfeiture of any hypothetical protection for documents by virtue of sharing them with the Attorney General or others.

### 2. The "First Amendment Privilege"

The Subpoenaed Parties inexplicably asserted and then refused to withdraw what they claim is a First Amendment Privilege to speak and associate anonymously. To the extent courts have even recognized such a privilege, it is only in contexts where discovery would chill speech and dissuade associational activity due to the risk of government retaliation. *See NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 462-66 (1958) (compelled disclosure of the names and addresses of all NAACP members in suit by state might induce members to withdraw and dissuade others from joining); *see also In re Verizon Internet Servs., Inc.*, 257 F. Supp. 2d 244, 259 & n.17 (D.D.C. 2003), *rev'd on other grounds, Recording Indus. Ass'n of Am., Inc. v. Verizon Internet Servs.*, 351 F.3d 1229 (D.C. Cir. 2003) ("Courts have acknowledged some limitations on the subpoena power when its invocation affects First Amendment rights involving anonymity"; speakers may choose anonymity due to such concerns as "'fear of economic or official retaliation . . . [or] social ostracism'" (citations omitted)). That is not at issue here. The press has already reported extensively on the direct role the Subpoenaed Parties played in AG Hood's investigation of Google. There is no anonymity to protect. *See Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.3d 1, 9, 22 (D.C. Cir. 2009) (First Amendment provides no guarantee for special interests against having "their participation in controversial lobbying . . . revealed;" "disclosures by those endeavoring to influence the political system" are subject to less demanding scrutiny). And these parties could not possibly show that their production of documents here will result in government reprisal against their members. In short, the First

-19-

Amendment does not entitle the Subpoenaed Parties to conceal evidence of the anti-Google campaign that they and AG Hood have waged.

### 3. The "Law Enforcement Privilege"

The "law enforcement privilege" that the Subpoenaed Parties assert, is similarly inapplicable. Typically invoked by government agencies, the "law enforcement" privilege is "a qualified privilege protecting investigative files in an ongoing criminal investigation or information which would reveal the identity of confidential informants." *Coughlin v. Lee*, 946 F.2d 1152, 1159 (5th Cir. 1991) (citation omitted); *see also Tri-State Hosp. Supply Corp. v. United States*, No. 00-1463 (HHK/JMF), 2005 U.S. Dist. LEXIS 33156, at *26-27 (D.D.C. Dec. 16, 2005) (law enforcement privilege exists to "to prevent disclosure of information that would be contrary to the public interest in the effective functioning of law enforcement and to preserve the integrity of law enforcement techniques.") (citation and internal quotations omitted). The Subpoenaed Parties have not attempted to explain how their documents could possibly expose any investigative files or reveal the identity of confidential informants.[22]

### 4. "Common Interest Doctrine"

"Although occasionally termed a privilege itself, the common interest doctrine is really an exception to the rule that no privilege attaches to communications between a client and an attorney in the presence of a third person." *United States v. BDO Seidman, LLP*, 492 F.3d 806, 815 (7th Cir. 2007). The doctrine prevents the loss of privileged status "if a privileged communication is shared with a third person who has a common legal interest with respect to the subject matter of the communication." *In re Santa Fe*, 272 F.3d at 711. To invoke the

---

[22] Even if it applied, the law enforcement privilege is only a qualified one. *Coughlin*, 946 F.2d at 1160; *see also In re Sealed Case*, 856 F.2d 268, 272 (D.C. Cir. 1988) ("[P]ublic interest in nondisclosure must be balanced against the need of a particular litigant for access to the privileged information."). As explained above, these materials are directly relevant to the claims and defenses in the action and are not available from other sources. Accordingly, any qualified privilege would have to yield.

doctrine, parties must be under a "palpable threat of litigation at the time of the communication." *See id.*; *Holland v. Island Creek Corp.*, 885 F. Supp. 4, 6 (D.D.C. 1995) (the common interest doctrine protects disclosure of otherwise privileged information, but only where disclosure is made "due to actual or anticipated litigation" and "for the purpose of furthering a common interest." (citing *United States v. Am. Tel. & Tel. Co.*, 642 F.2d 1285, 1298-99 (D.C. Cir. 1980). The fact that parties may share commercial interests or business objectives is not sufficient to justify invocation of the common interest doctrine.[23] Disclosure of privileged communications to other parties in that setting waives the privilege.

The Subpoenaed Parties cannot claim the protections of the common interest doctrine with respect to responsive documents they shared among themselves, with Attorney General Hood, and with countless other parties.[24] *See Baricuatro*, 2013 U.S. Dist. LEXIS 96413, at *37 (no possible commonality of interest between lobbyists and government agency that might provide basis for maintaining privilege). They were unable during the parties' meet and confer, to identify any litigation that was contemplated at the time when these documents were created and/or shared. They are certainly not co-defendants in any action, and it seems the only "common interest" they can identify is a desire to hide their backroom anti-Google efforts. That is plainly inadequate.

---

[23] *See Ferko v. NASCAR*, 219 F.R.D. 403, 406 n.1 (E.D. Tex. 2003) ("A commercial interest, however, does not trigger the common interest doctrine."); *United States ex rel. Landis v. Tailwind Sports Corp.*, 303 F.R.D. 419, 427 (D.D.C. 2014) (for common interest to apply, "the parties' shared interest must be both legal and ongoing."); *Bank Brussels Lambert v. Credit Lyonnaise (Suisse) S.A.*, 160 F.R.D. 437, 447 (S.D.N.Y 1995) (common defense doctrine "does not encompass a joint business strategy which happens to include as one of its elements concern about litigation").

[24] The Mullin Article reports that most of the information regarding the Subpoenaed Parties' efforts to influence Attorneys General to pursue Google was shared with a group of more than 30 lawyers, including several from the MPAA and RIAA, as well as each of the six big studios."

## 5. The Attorney Client Privilege

The MPAA and DCA were working through lawyers in their lobbying efforts. And lawyers at Jenner were apparently leading those efforts. But the mere involvement of lawyers does not cloak the entire enterprise in the attorney-client privilege. Documents in which lawyers discuss campaign contributions, ghostwrite materials for government officials, and devise strategies to influence public policy, are not communications made for the purpose of obtaining legal advice, and are not privileged. *See In re Grand Jury Subpoenas Dated March 9, 2001*, 179 F. Supp. 2d 270, 289-91 (S.D.N.Y. 2001) (no privilege for communications between lawyer and client on whose behalf he was lobbying for a presidential pardon: "Communications about non-legal issues such as public relations, the solicitation of prominent individuals or persons with access to the White House ... to support the Petition, and strategies for persuading the President to grant the petition are not privileged."); *In re Chevron Corp.*, 749 F. Supp. 2d 141, 165-66 (S.D.N.Y. 2010) (privileges are "not intended, however, to obscure what is essentially a lobbying and political effort, even one undertaken by a lawyer. . . .[M]atters conveyed to the attorney for the purpose of having the attorney fulfill the lobbyist role do not become privileged by virtue of the fact that the lobbyist has a law degree or may under other circumstances give legal advice to the client.") (citation and internal quotations omitted); *see also Minebea Co. v. Papst*, 228 F.R.D. 13, 21 (D.D.C. 2005) (ordering production of documents circulated to counsel where there was "no indication that any of these memoranda were prepared for a predominantly legal purpose."); *Boca Investerings Pshp. v. United States*, 31 F. Supp. 2d 9, 12 (D.D.C. 1998) ("When a lawyer acts merely to implement a business transaction . . . , the lawyer is like any other agent of the corporation whose communications are not privileged." (citations omitted). Beyond that, as noted, the sharing of a document with AG

-22-

Hood and other third parties waives any attorney-client privilege that would otherwise attach to a document. *See supra*, p. 16-18; *El Paso*, 682 F.2d at 539.

But even if there are documents over which a claim of attorney-client privilege might be defensible, the Subpoenaed Parties were obligated to substantiate that claim in a privilege log. They have failed to do.  As Jenner itself warns in its Handbook for Analyzing Issues Under The Attorney-Client Privilege And The Work Product Doctrine, the failure to timely provide detailed privilege logs can have "severe consequences, including waiver of the privilege." Jenner Privilege Handbook (citing *Felham Enters. (Cayman) Ltd. v. Certain Underwriters at Lloyds,* No. Civ. A. 02-3588, 2004 WL 2360159, at \*3 (E.D. La. Oct. 19, 2004) (finding a waiver where defendant failed to produce a timely privilege log and the log it ultimately produced failed to sufficiently describe the withheld documents)).  Jenner specifically cites cases in the subpoena context where the failure to provide a privilege log prior to the return date of a subpoena resulted in waiver of "any privilege." *Id.*  As Jenner's summary of one of those cases explains, Rule 45 requires parties to "serve either written objections or move to quash within the earlier of the time fixed for compliance or fourteen days after service *and, if withholding subpoenaed material on grounds of privilege, must provide a privilege log.*" *Id.* (emphasis added) (summarizing *In re Chevron Corp.*, 749 F.Supp.2d 170  (S.D.N.Y. 2010)); *see also Burns v. Imagine Films Entm't, Inc.*, 164 F.R.D. 589, 594 (W.D.N.Y. 1996) (finding Defendant waived privilege by taking position that it would not create a privilege log until after the court ruled on its overbreadth and burden objections).[25]

---

[25] *See also United States ex rel. Barko v. Halliburton Co.*, No. 1:05-CV-1276, 2014 U.S. Dist. LEXIS 181353, at \*54-55 & n. 103 (D.D.C. Nov. 20, 2014) (citing Fed. R. Civ. P. 45(d)(2)(A) ("In general, a party's failure to provide a privilege log in civil litigation can waive any claim of privilege to the documents not produced or identified in a privilege log."); Charles Wright & Arthur Miller, Fed. Prac. & Proc., § 2464 ("Federal Courts consistently have held that such a party is required to produce a document index or privilege log and that the failure to produce a log of sufficient detail constitutes a waiver of the underlying privilege or work product claim.");

The Subpoenaed Parties' failure to supply the log required by Rule 45 should dispose of any claim of privilege over the documents that Google has requested.[26]

## III.   The "Form Objections" Are Baseless

In addition to their privilege contentions, the Subpoenaed Parties cluttered their responses with boilerplate objections. They then refused, during the parties' meet and confer, to withdraw or substantiate those objections. The objections are meritless and the Court should quickly dispatch them.

*The Requests Are Not Vague or Ambiguous.* The Subpoenaed Parties bear the burden of showing how the requests are vague or ambiguous. *Heller v. City of Dallas*, 303 F.R.D. 466, 491 (N.D. Tex. 2014) ("A party objecting on these grounds must explain the specific and particular way in which a request is vague." (citations and internal quotations omitted)); *Kline v. Berry*, 287 F.R.D. 75, 78 (D.D.C. 2012) ("a party objecting to a document request must specifically show how the request is burdensome, overly broad, vague, or outside the scope of discovery.") Google's requests are specific and easily understood. The objection cannot stand.

*The Requests Are Not Overbroad or Unduly Burdensome.* The Subpoenaed Parties likewise cannot carry their burden of showing the requests are overbroad or burdensome. *See Heller*, 303 F.R.D. at 491; *Chubb Integrated Sys. v. Nat'l Bank of Washington*, 103 F.R.D. 52, 59-60 (D.D.C. 1984). Google's requests are quite narrow. It seeks communications between and among identified parties, about specific subjects, and the requests readily allow for the

---

further citations omitted); *see also Blackard v. Hercules, Inc.*, Nol 2:12-CV-175-KS-MTP, 2014 U.S. Dist. LEXIS 75934, at *14-15, 2014 WL 2515197 (S.D. Miss. June 4, 2014) ("It is well within this Court['s] discretion to find a waiver of the asserted privileges for failing to timely produce a privilege log." (citations omitted)).

[26] While the Subpoenaed Parties' failure to provide a timely privilege log should be dispositive of their privilege assertions, if the Court instead believes it is not too late for them to claim privilege, Google respectfully requests the Court order the production of a comprehensive privilege log along with an expedited briefing schedule for any privilege-related disputes given the very limited period that Judge Wingate allowed for discovery in the underlying case.

conduct of electronic searches using specific keywords (e.g. "Hood," "Google" "Attorney

General"). To the extent there is any minimal burden associated with that process, it is by no

means undue. Rather, it is the natural result of these parties having involved themselves so

intimately in the Attorney General's unlawful conduct in the hopes of serving their own

interests. These form objections likewise do nothing for the Subpoenaed Parties.

## IV.   A Confidentiality Order Is Not Appropriate

The Subpoenaed Parties refuse to produce any documents until a confidentiality order is

entered to shield the documents from public view. No such order exists in the underlying case

and Google submits none is appropriate here.

A party seeking a confidentiality order "must articulate specific facts to support its

request and cannot rely on speculative or conclusory statements." *Friends of the Earth v.*

*United States DOI*, 236 F.R.D. 39, 41 (D.D.C. 2006) (quoting *Low v. Whitman*, 207 F.R.D. 9,

10-11 (D.D.C. 2002)). Despite Google's request, the MPAA and Jenner have not identified to

Google any "specific facts" justifying a confidentiality order for the documents at issue. That is

not a surprise. Google's case is directed to a matter of significant public concern -- the

prolonged coercion of Google by a public official in derogation of the free speech rights of both

Google and its users. According to numerous press accounts, this coercion was at the behest of

special interests who exercised remarkable influence over the Attorney General. It is difficult to

see why documents relating to those activities should be kept from the public. Regardless, the

Subpoenaed Parties have not established why they should.

## Conclusion

For the foregoing reasons, Google respectfully requests an order compelling the Subpoenaed Parties immediately to produce all documents responsive to Google's requests.

Dated: June 1, 2015                  Respectfully submitted,


WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By: _____
Veronica S. Ascarrunz (D.C. Bar No. 494474)
1700 K Street, NW
Fifth Floor
Washington, DC 20006
Email: vascarrunz@wsgr.com
Phone: (202) 973-8800
Fax: (202) 973-8899


David H. Kramer (*pro hac vice* forthcoming)
Michael H. Rubin (*pro hac vice* forthcoming)
WILSON SONSINI GOODRICH & ROSATI PC
650 Page Mill Road
Palo Alto, CA 94304
Email: dkramer@wsgr.com
Email: mrubin@wsgr.com
Phone: (650) 496-9300
Fax: (650) 493-6811


*Attorneys for Petitioner*
GOOGLE INC.